IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIFEPOINT HOSPITALS, INC.<br>d/b/a Southern Tennessee Medical Center<br>1851 Hospital Road<br>Winchester, Tennessee 37398<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL O. LEAVITT, Secretary of the<br>United States Department of Health and<br>Human Services<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20585<br><br>Defendant. | CASE NO.<br><br>COMPLAINT FOR JUDICIAL REVIEW<br>PURSUANT TO THE MEDICARE ACT,<br>42 U.S.C. § 1395oo(f)<br><br>CASE NUMBER 1:05CV02224<br>JUDGE: James Robertson<br>DECK TYPE: Administrative Agency Rev:<br>DATE STAMP: 11/16/2005 |

Plaintiff LIFEPOINT HOSPITALS, INC. d/b/a Southern Tennessee Medical Center ("Plaintiff") alleges as follows:

## JURISDICTION AND VENUE

1. This action arises under Title XVIII of the Social Security Act, as amended, 42 United States Code ("U.S.C.") §§ 1395-1395ggg ("Medicare Act").

2. Jurisdiction exists under 42 U.S.C. § 1395oo(f).

3. Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f).

## PARTIES

4. Plaintiff LIFEPOINT HOSPITALS, INC. d/b/a Southern Tennessee Medical Center is, and has been at all times relevant to this action, a duly certified provider of hospital services under Medicare and has been assigned a Medicare provider Number. Plaintiff is a 131 bed acute care hospital located in Winchester, Tennessee.

1007424.1

5. Defendant MICHAEL O. LEAVITT, Secretary of the United States Department of Health and Human Services ("Secretary"), is the federal officer responsible for administering the Medicare program.

## INTRODUCTION

6. By this action, the Plaintiff challenges the Secretary's application of a Medicare statute that directs the Secretary to make additional Medicare payments to hospitals that serve "a significantly disproportionate number of low-income patients." These additional payments are commonly referred to as disproportionate share hospital or "DSH" payments. Under the relevant statute, the term "low-income" patients includes patients eligible for medical assistance under a state plan of medical assistance approved under Title XIX of the Social Security Act. When computing the Plaintiff's eligibility for additional DSH payments during the fiscal year at issue, the Secretary applied a policy requiring the exclusion of hospital days attributable to patients eligible for assistance under Title XIX if the patients received benefits through a program known as a "section 1115 waiver" program. The Secretary's action in this case, to the extent it precludes patient days attributable to Section 1115 waiver populations from factoring into the DSH payment calculation for portions of any cost reporting period prior to January 20, 2000, contravenes the plain and unambiguous wording of the controlling Medicare statute, is inconsistent with congressional intent, and is arbitrary, capricious and otherwise contrary to law. Further, the Secretary's application of the DSH statute inappropriately draws a distinction between similarly situated Medicare providers in violation of the right to equal protection of laws afforded by the United States Constitution.

## THE MEDICARE PROGRAM

7. The Medicare Act establishes a system of health insurance for the aged and disabled. 42 U.S.C. §§ 1395-1395ggg. The Medicare program is federally funded and is

administered by the Secretary through the Centers for Medicare and Medicaid Services ("CMS").[1] 42 U.S.C. § 1395kk; 42 Federal Register ("Fed. Reg.") 13,202 (Mar. 9, 1977).

8. Medicare providers are required to submit an annual "cost report" which, among other things, identifies the total costs incurred during the course of a 12 month fiscal year. 42 Code of Federal Regulations ("C.F.R.") §§ 413.20, 413.24. Fiscal intermediaries are required to analyze and audit the cost report and to inform the provider of a determination of the amount of total Medicare reimbursement owing the provider. 42 C.F.R. § 405.1803. The determination is referred to as the notice of amount of program reimbursement ("NPR"). 42 C.F.R. §§ 405.1801(a), 405.1803.

9. Fiscal intermediaries make Medicare payments to providers pursuant to contracts with the Secretary. 42 U.S.C. § 1395h. If a provider of Medicare services is dissatisfied with its intermediary's determination of Medicare program reimbursement for a particular fiscal period and qualifies under 42 U.S.C. § 1395oo(a), the provider may appeal the intermediary's decision to the Provider Reimbursement Review Board ("PRRB" or "Board"). 42 U.S.C. § 1395oo.

10. The PRRB may determine either on its own motion or at the request of a provider that it lacks the authority to decide a "question of law or regulations relevant to the matters in controversy." 42 U.S.C. § 1395oo(f)(1). A case for which the PRRB makes such a determination is eligible for what is generally known as expedited judicial review ("EJR").

11. If the PRRB determines that it lacks the authority to decide the issue raised by the provider in its appeal, a provider may seek judicial review of that issue by filing a lawsuit within 60 days of the receipt of the PRRB's EJR determination. 42 U.S.C. § 1395oo(f)(1).

---

[1] At certain times relevant to this Complaint, CMS was known as the Health Care Financing Administration ("HCFA"). The agency will be referred to herein as either CMS or HCFA, depending on the context, as appropriate.

## THE MEDICAID PROGRAM AND SECTION 1115 WAIVERS

12. Medicaid is a joint federal and state program established in Title XIX of the Social Security Act ("the Act") to provide "medical assistance" to indigent persons who meet certain eligibility criteria. 42 U.S.C. § 1396; 42 C.F.R. § 430.0.

13. The term "medical assistance" means "payment of part or all of the cost" of 25 different types of health care services listed in the statute, including inpatient hospital services. 42 U.S.C. § 1396d(a).

14. To participate in the Medicaid program and receive Federal funding, a State must submit a "State plan" that meets federal requirements for approval by the Secretary of the U.S. Department of Health and Human Services ("the Secretary"). 42 U.S.C. §§ 1396, 1396a; 42 C.F.R. Part 430. Under an approved State plan, a State receives Federal matching funds according to a "Federal medical assistance percentage," or "FMAP," for State expenditures on medical assistance. 42 U.S.C. §§ 1396, 1396d(b); 42 C.F.R. § 433.10.

15. Section 1115 of the Social Security Act, as codified at 42 U.S.C. § 1315, allows the Secretary to approve State research and demonstration projects that promote the objectives of the Title XIX Medicaid program. 42 U.S.C. § 1315. Section 1115, in relevant part, reads as follows:

> (a) In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [title] . . . XIX . . . in a State or States-
>
> (1) the Secretary may waive compliance with any of the requirements of section . . . 1902 [42 U.S.C. § 1396a] of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project, and
>
> (2)(A) costs of such project which would not otherwise be included as expenditures under section . . . 1903 [42 U.S.C. § 1396b] of this title . . . shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved under such [title], or for administration of such State plan or plans, as may be appropriate . . .

16. Section 1115(a)(1) allows the Secretary to waive the requirements of section 1902, which contains Medicaid State plan requirements, including requirements concerning eligible populations. 42 U.S.C. § 1315(a)(1). Section 1115(a)(2)(A) allows a State to receive federal matching funds for medical assistance, including medical assistance provided to expanded eligibility populations, for which the State would not ordinarily be entitled to receive federal matching funds. 42 U.S.C. § 1315(a)(2). Importantly, such federal funding is required by Section 1115 to be deemed as expenditures "under the State plan or plans approved under [title XIX]. . . ." 42 U.S.C. § 1315(a)(2)(A).

17. Under some Section 1115 waivers, the State furnishes medical assistance to a population that otherwise could have been made eligible for Medicaid. Under other Section 1115 waivers, the State furnishes medical assistance to expanded eligibility populations that could not otherwise have been made eligible for Medicaid. 65 Fed. Reg. 3136 (Jan. 20, 2000). As stated by the Secretary, "the statute allows for the expansion populations to be treated as Medicaid beneficiaries." 65 Fed. Reg. at 3137.

## MEDICARE DSH PAYMENTS

18. Since 1983, the Medicare program has paid most hospitals for the operating costs of inpatient hospital services under a prospective payment system ("PPS"). 42 U.S.C. § 1395ww(d)(1)-(5); 42 C.F.R. Part 412. Under PPS, Medicare pays hospitals a standardized amount per case subject to certain payment adjustments. *Id.* A hospital that serves a disproportionate share of low-income patients, or a DSH, is also entitled to an upward adjustment to the Medicare PPS payments. 42 U.S.C. § 1395ww(d)(5)(F). Congress established the DSH adjustment to account for the relatively higher costs associated with furnishing health care services to low-income patients, who tend to be sicker than other patients.

19. A hospital's qualification for a Medicare DSH adjustment and the amount of the Medicare DSH payment due a hospital are determined, in part, by its "disproportionate patient percentage" ("DSH patient percentage"), which is a proxy for the Provider's utilization by low income patients. 42 U.S.C. § 1395ww(d)(5)(F)(v). The DSH patient percentage is defined as the sum of two fractions expressed as percentages. 42 U.S.C. § 1395ww(d)(5)(F)(vi). One of these fractions is commonly known as the "Medicaid Percentage." The numerator of the fraction used to compute the Medicaid Percentage consists of the number of the Provider's patient days attributable to patients who were "eligible for medical assistance under a State plan approved under Title XIX, but who were not entitled to benefits under Part A of [Medicare]." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

20. The meaning of the statutory language "eligible for medical assistance under a State plan approved under Title XIX" is key to the analysis of the Provider's DSH payment issue. From 1986 through 1997, HCFA interpreted this language to exclude inpatient days attributable to patients who were eligible for Medicaid benefits if Medicaid did not actually make payment for those inpatient days. *See* 51 Fed. Reg. 16,777 (May 6, 1986); 51 Fed. Reg. 31,460-61 (Sept. 3, 1986). On February 27, 1997, through HCFA Ruling 97-2, HCFA rescinded the policy of excluding eligible-but-unpaid Medicaid patient days from the numerator of the Medicaid Percentage. 42 C.F.R. § 412.106(b)(4)(I)(2002).

## TREATMENT OF SECTION 1115 WAIVER DAYS

21. Until early 2000, the Medicare regulations did not specifically address the treatment of Section 1115 waiver days under DSH, and HCFA policy on this issue was not otherwise made clear. Accordingly, some hospitals were allowed to include in the DSH calculation days attributable to Section 1115 expansion populations, while others were not. 65 Fed. Reg. at 3,137 (prior to January 2000, "because [HCFA's] prior guidance on certain aspects

of [the] Medicare DSH policy was insufficiently clear, many hospitals in States with approved section 1115 expansion waivers [had] been receiving Medicare DSH payments reflecting the inclusion of expansion population days.").

22. Through Program Memorandum A-99-62, HCFA instructed fiscal intermediaries to allow the inclusion of "ineligible waiver or demonstration population days" for cost reporting periods beginning before January 1, 2000, to the extent that they had allowed their inclusion for cost reporting periods settled prior to October 15, 1999. Health Care Financing Administration Program Memorandum A-99-62, "Clarification of Allowable Medicaid Days in the Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation" (Dec. 1, 1999) ("PM A-99-62"). Under PM A-99-62, certain hospitals were allowed to include "uninsured days," and others were not, for the same time periods.

23. While PM A-99-62 mentions that some hospitals had received "erroneous" DSH payments as a result of including "ineligible waiver or demonstration population days" in the number of Medicaid days used for DSH calculations, it does not expressly state HCFA's policy on the treatment of Section 1115 waiver days. Attached to PM A-99-62 is a chart that "summarizes some, but not necessarily all, of the types of days to be excluded from (or included in) the Medicare DSH adjustment calculation." Absent from this detailed list is any reference to "Section 1115 waiver days." PM A-99-62.

24. On January 20, 2000, HCFA issued an "interim final rule with comment period" to address the treatment under the DSH statute of inpatient days attributable to patients who were eligible for Medicaid in a State with a Section 1115 Medicaid waiver. 65 Fed. Reg. 3,136. Through this interim final rule, HCFA established that effective with discharges occurring on or after January 20, 2000, hospitals may include the patient days of all populations eligible for Title XIX matching payments through a State's Section 1115 waiver in calculating the Provider's

Medicare DSH adjustment. 65 Fed. Reg. at 3,136-37. The regulation codifying this policy is found at 42 C.F.R. § 412.106(b)(4)(ii) (2002).

25.   When it finalized the interim final rule as part of the 2001 inpatient PPS rule, HCFA described its Section 1115 waiver days policy as follows:

> While [HCFA] initially determined that States under a Medicaid expansion waiver could not include those expansion waiver days as part of the Medicare DSH adjustment calculation, we have since consulted extensively with Medicaid staff and determined that section 1115 expansion waiver days are utilized by patients whose care is considered to be an approved expenditure under Title XIX.... [T]hese days are considered to be Title XIX days by Medicaid standards.

*See* 65 Fed. Reg. 47,026, 47,087 (Aug. 1, 2000).

## FACTS AND PROCEDURAL HISTORY OF THIS CASE

26.   The State of Tennessee first received approval for its Section 1115 demonstration project, called TennCare, on November 19, 1993. On January 1, 1994, Tennessee became the first state to move its Medicaid program enrollees to a statewide demonstration project. In addition to Medicaid eligible persons, TennCare offered coverage to expansion populations of uninsured and uninsurable persons, regardless of income, who would not have been eligible for Medicaid under the program as it existed prior to the waiver.

27.   Under TennCare, as described in a letter from HCFA Administrator Thomas Scully to the State of Tennessee, the State is entitled to receive Title XIX federal matching funds for expenditures for the populations who would not have otherwise been eligible for Medicaid in that State. HCFA invoked Section 1115 in describing this entitlement:

> Under the authority of section 1115(a)(2) of the Social Security Act, expenditures made by the State for [certain] items ... (which are not otherwise included as expenditures under section 1903) shall, for the period of the project, be regarded as expenditures under the State's Title XIX plan.

28.   The first of these items listed in the letter is: "Expenditures for the following eligibility groups: those who are uninsurable because of pre-existing conditions, and those who

are uninsured." According to the "Special Terms and Conditions" ("STCs") governing TennCare, the State receives federal matching funds for "actual cash capitation payments . . . made by the State to MCOs for each TennCare enrollee[,]" and "[t]he Standard Medicaid funding process [is] used during the TennCare demonstration."

29. On its as-filed Medicare cost report for fiscal year ended December 31, 1999 ("FYE 12/31/99"), the Plaintiff included all of its Tennessee Section 1115 waiver days in the number of Medicaid eligible days used to calculate the Medicaid Percentage of the DSH payment adjustment. More specifically, it included in this number the inpatient days attributable to patients who would have been eligible for Medicaid before the waiver, as well as days attributable to expansion populations of uninsured and uninsurable patients who became eligible for Medicaid by virtue of the waiver.

30. On September 20, 2002, the Plaintiff was issued an NPR for its FYE 12/31/99 by its Medicare fiscal intermediary, Riverbend Government Benefits Administrator ("Intermediary"). In auditing the Plaintiff's cost report, the Intermediary removed from the number of Medicaid eligible days the days attributable to the uninsured patients, and thereby reduced the Plaintiff's number of Medicaid eligible days from 2,762 to 2,049. The exclusion of these Title XIX days unlawfully reduced the Plaintiff's DSH payment adjustment.

31. The Plaintiff timely appealed to the PRRB the Intermediary's audit adjustment excluding the Section 1115 waiver days from the calculation of the Plaintiff's DSH payment adjustment for FYE 12/31/99.

32. By letter dated July 7, 2005, the PRRB notified both the Plaintiff and the Intermediary that it was considering issuing a determination that it lacked the authority to decide the Plaintiff's appeal and that EJR therefore was the appropriate procedure for resolving the case.

In the letter, the PRRB requested that the Plaintiff and Intermediary each submit comments regarding the PRRB's proposal for declaring the case eligible for EJR.

33. Neither the Plaintiff nor the fiscal intermediary objected to the Board granting EJR in the case. However, in commenting to the PRRB about the propriety of EJR, the Plaintiff made clear that it only was seeking through its appeal to enforce the Medicare DSH statute and regulation in effect during the relevant fiscal year and was not seeking the invalidation of any statute, regulation or HCFA ruling in effect during the relevant period.

34. On September 19, 2005, the PRRB issued a letter certifying the Plaintiff's appeal for EJR. The letter was received by the Plaintiff on September 21, 2005. (A copy of the PRRB's letter designating this case for EJR is attached hereto as Exhibit A). Accordingly, pursuant to 42 U.S.C. § 1395oo(f)(1), all administrative remedies have been exhausted and this case is now ripe for judicial review.

35. This Complaint is filed within 60 days of receipt of the PRRB's determination, as required by 42 U.S.C. §1395oo(f)(1).

## INVALIDITY OF THE SECRETARY'S ACTION

36. The Secretary's action in this case is reviewable by this Court pursuant to the provisions of the Administrative Procedure Act, 5 U.S.C. § 706. 42 U.S.C. § 1395oo. The Secretary's failure to include all Section 1115 waiver days in calculating the Plaintiff's eligibility for a Medicare DSH payment adjustment for the fiscal year at issue is inconsistent with and unauthorized by the Medicare statute and regulations, is arbitrary and capricious, and is not authorized by the Equal Protection clause of the United States Constitution, for the following reasons, among others:

    a. The plain language of the Social Security Act requires the inclusion in the DSH calculation of all Section 1115 waiver days. The Medicare DSH statute provides that the

numerator of the DSH Medicaid Percentage include days for patients who were "eligible for medical assistance under a State Plan approved under Title XIX." Under the governing statute, the DSH calculation should include all patients who were eligible for medical assistance under a Medicaid state plan implemented through a Section 1115 waiver, including uninsured patients in expansion populations. All of the Plaintiff's TennCare days are properly considered patient days associated with patients eligible for medical assistance under a state plan approved under Title XIX and therefore must be included in the Plaintiff's DSH calculation.

   b.    Nothing in the Medicare regulations effective for cost reporting periods prior to the one at issue in this case required or allowed expansion waiver days to be excluded from the DSH calculation. In fact, HCFA has acknowledged expressly that Section 1115 days are considered Title XIX days for DSH purposes.

   c.    The Secretary's application of the DSH statute in this case is arbitrary and capricious. As part of its rulemaking process for fiscal year 2000, HCFA declared that "inpatient hospital days for . . . individuals eligible for Title XIX matching payments under a section 1115 waiver are to be included as Medicaid days for purposes of the Medicare DSH adjustment calculation." However, HCFA indicated that the policy of including such waiver days is effective only for hospital discharges occurring on or after January 20, 2000. There is no reasonable basis for interpreting the Medicare DSH statute, which has not changed with respect to the language regarding the Medicaid Percentage, in a way that only takes effect on January 20, 2000 and excludes Section 1115 waiver days from the Medicaid Percentage for prior periods.

   d.    The Secretary's application of the DSH statute in this case inappropriately distinguishes between similarly situated Medicare providers without any rational basis. Through PM A-99-62, HCFA ordered fiscal intermediaries to reopen cost reports and include Section 1115 waiver days in the DSH calculation for Medicare providers that had appeals on file with the

PRRB on or before October 15, 1999. Any providers that did not have appeals on file by the deadline set forth in PM A-99-62, such as the Plaintiff, were not eligible for an adjustment. Under the approach to calculating DSH eligibility established by HCFA through PM A-99-62, hospitals with the same kind of Section 1115 waiver days are treated differently without any distinction called for by the governing statute or regulation. It is arbitrary and capricious for HCFA to treat similarly-situated hospitals differently by applying one interpretation of its rules in some cases and a different interpretation in other cases.

   e. The Secretary's methodology for calculating DSH payments under PM A-99-62 violates the Equal Protection component of the Due Process clause set forth in the 5th Amendment to the United States Constitution. HCFA may not set forth an arbitrary appeal deadline that places the Plaintiff in the position of not being able to include all TennCare days in the DSH Medicaid Percentage when another provider with the same (or very similar) fiscal year end, in the same state, with the same type of TennCare days, can include all its TennCare days solely because the cost report for that provider was audited in a more timely fashion or an NPR for that provider was issued to that provider earlier. A provider's DSH calculation should not and cannot depend on the timing of the audit cost report or the ensuing appeal letter. The Secretary's October 15, 1999 deadline for appeal therefore violates basic notions of equal protection of the law.

   f. The Secretary has offered no reasoned analysis and identifies no relevant factual differences to justify the disparate treatment of like hospitals with respect to the inclusion of Section 1115 waiver days in the DSH payment calculation.

   g. The Secretary's treatment of Section 1115 waiver days conflicts with the intent of the Medicare DSH statute. The purposes of the DSH adjustment is to compensate hospitals for the additional cost associated with furnishing care to a large number of indigent

patients. The expansion population in Tennessee, which the Plaintiff treated, consists entirely of indigent patients. The Secretary therefore has denied the Plaintiff additional reimbursement to which it is entitled for treating a disproportionate share of low income patients.

**WHEREFORE,** Plaintiff requests relief as follows:

1. For an order reversing the fiscal intermediary's audit adjustment to the Plaintiff's Medicare cost report for the fiscal year at issue, and requiring the Secretary to include all Section 1115 waiver days, including days for uninsured patients in expansion populations, in the Medicaid Percentage of the Medicare DSH calculation;

2. For interest pursuant to 42 U.S.C. § 1395oo(f)(2);

3. For costs of suit; and

4. For such other and further relief as the Court deems appropriate.

DATED: November 16, 2005

Respectfully submitted,

AKIN GUMP STRAUSS HAUER
& FELD, LLP

John R. Jacob
D.C. Bar No. 444412
1333 New Hampshire Avenue N.W.
Washington, DC 20036
Tel: 202-887-4582
Fax: 202-887-4288

Of Counsel

Jon P. Neustadter
Jordan B. Keville
HOOPER, LUNDY & BOOKMAN, INC.
1875 Century Park East, Suite 1600
Los Angeles, California 90067
Tel: 310-551-8151
Fax: 310-551-8181

Attorneys for Plaintiff